LINDA G. CHOINIERE,

    Plaintiff,

vs.    No. CV-00-1328 JP/RLP

PRESBYTERIAN HEALTHCARE SERVICES, INC.,
a New Mexico corporation,

# PHS' MEMORANDUM BRIEF IN RESPONSE TO
# PLAINTIFF'S MOTION IN LIMINE

COMES NOW, Defendant Presbyterian Healthcare Services ("PHS"), and submits this Memorandum Brief in response to Plaintiff's Motion In Limine To Exclude The Testimony of Expert Witness Janet Toney.

A.    Introduction

Plaintiff's position as Director of Medicare Sales for Secure Horizons, a Medicare + Choice healthcare product for seniors, was eliminated on December 31, 1999 along with nine (9) other sales and marketing positions within Secure Horizons. The position eliminations resulted directly from a decision by Presbyterian Health Plan ("PHP") to stop active sales and marketing of the Secure Horizons' product, as a result of financial losses of about $26 million in 1999, including losses of $18 million by Secure Horizons.

Plaintiff alleges that the elimination of her position violated the Family Medical Leave Act ("FMLA"), and she seeks damages for lost wages, benefits and commissions. PHS has raised the affirmative defense that Plaintiff has failed to reasonably mitigate her claimed damages.

In discovery, Plaintiff has stated that she has checked literally thousands of jobs primarily on Internet websites and in the local newspapers and the Wall Street Journal.

Plaintiff states that virtually all of these except a handful are "not relevant," and she has been unable to find employment.

Plaintiff has retained Brian McDonald, Ph.D. who has prepared an economic evaluation in which he "assumes" Plaintiff will be unable to find other employment for one year, that she will then only find employment at less than one-half of what she made at PHS, and that it will take four years for her to be restored to her pre-layoff salary level. Dr. McDonald's assumptions do not even come close to meeting the Daubert factors, and he acknowledges that he has resorted solely to general labor data precisely because he has not received the type of particularized vocational, labor market analysis provided by PHS' expert, Janet Toney.

PHS is comparing in its response to Plaintiff's attempt to exclude Janet Toney's testimony, the testimony and opinions of Brian McDonald because Dr. McDonald's generalized theories and techniques graphically demonstrate the type of analysis deemed unreliable by the Court in Kumho Tire, and, at the same time, emphasize how, by contrast, Janet Toney's individualized analysis is much more reliable and valid because it is specifically tied to the facts and issues in this case – Plaintiff's actual qualifications, and the jobs that are actually available in her relevant labor market.

Janet Toney's specialized knowledge will plainly assist the trier of fact to understand the damages evidence or to determine whether Plaintiff reasonably mitigated her damages.

B. The Gatekeeping Requirements of Kumho Tire

The Court in Kumho Tire Company v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167 (1999), held that "Daubert's general holding – setting forth the trial judge's general 'gatekeeping' obligation – applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized knowledge.'" 119 S.Ct. at 1171. The Court further held:

2

> ". . . the trial court *may* consider one or more of the more specific factors that Daubert mentioned when doing so will help determine that testimony's reliability. But, as the Court stated in Daubert, the test of reliability is 'flexible', and Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case."

>                                             Id. (Emphasis in original)

Significant to the consideration of the cross-motions to exclude expert testimony in this case, is the directive in Kumho Tire that "the gatekeeping inquiry must be 'tied to the facts' of a particular case." Id, at 1175. (Emphasis added). "The factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." Id. Ultimately, the Court in Kumho Tire concluded that "too much depends upon the particular circumstances of the particular case at issue." Id. For example, the Court recognized that it may not be surprising in a particular case that a claim by a scientific witness has never been the subject of peer review, for the particular application at issue may never previously have interested any scientist. Id.

The application of the holdings of Kumho Tire to the particular issues and applications at issue in this case demonstrates that Janet Toney's individualized analysis, not Brian McDonald's general assumptions, may pass through the Kumho Tire gate.

C.   Janet Toney's Qualifications

Janet Toney has the requisite credentials in terms of her education, certifications and expertise. She has a Master's Degree in Rehabilitation Counseling. She is a Licensed Professional Counselor (LPC) in New Mexico, a Certified Life Care Planner (CLCP) nationally, a Certified Rehabilitation Counselor (CRC), a Certified Case Manager (CCM), and a Certified Disability Management Specialist (CDMS). Her employment experience includes twenty (20) years of vocational counseling, vocational rehabilitation consulting, and training. She has been qualified by the Social Security Administration as a Vocational Expert Witness since 1983, during which she has testified before federal

administrative law judges at least 1,000 times to opinions concerning the employability of individuals based on the same methodology used in this case. A copy of her resume detailing her qualifications, and expert witness experience (litigation) is attached as to Ms. Toney's Affidavit, which is Exhibit 1, hereto.

Ms. Toney has done analyses of earnings capacity/employability/ transferability of skills, and labor market analyses several thousand times in the last 20 years. This has included analyzing the labor market (available jobs suitable for the particular skills of the individual) in virtually every type of industry, and for persons who have and do not have mental or physical disabilities. She has extensive experience in job placement, which is a major part of job counseling and vocational rehabilitation counseling, which she has done for 20 years. Her work since 1981 has required her to continually study and analyze the job market, availability of jobs, and trends in the labor market. She has done this by consulting Department of Labor publications, the Occupational Outlook Handbook published nationally and locally, news and advertising periodicals, the Internet, and telephone contacts with employers.

While Plaintiff seems to want to differentiate between analyses of earning's capacity or employability of disabled individuals and persons without disabilities, Ms. Toney has extensive experience doing both, and both types of analyses involve similar methodologies. Ms. Toney testified that 10 to 15 of her usual caseload of 80 cases are vocational analyses like this one where there is no mental of physical disability, and another 15 of her 80 cases would involve some type of disability. Dep. of Toney, at 60-61, Exhibit 2, hereto. Indeed, analyses of employability and the labor market for persons without disabilities is far less difficult because able-bodied individuals like the Plaintiff do not have physical or mental limitations which may pose barriers to some available jobs.

D. Consideration of Plaintiff's Qualifications or Skill Set

1. Janet Toney Specifically Considered Plaintiff's Qualifications

Contrary to Plaintiff's mischaracterizations in her motion, the first step in Janet Toney's analysis was to analyze Plaintiff's resume and basic skill base, including the job requirements of her prior position, her prior employment, and her prior skills that could be utilized in other jobs. On the very first page of Ms. Toney's report, she itemized the records she reviewed, including the following:

- Plaintiff's Answers to Interrogatories, which sets forth the 16 contacts she made in 30 weeks
- Plaintiff's cover letter, and summary of qualifications, professional experience, and accomplishment (prepared by Plaintiff herself)
- Plaintiff's performance review while employed at PHP
- Plaintiff's performance evaluation while at PHS
- Plaintiff's Job Competency Assessment at PHS
- Plaintiff's 1998 Leadership Evaluation

Ms. Toney's affidavit (Exhibit 1, hereto) describes how these documents gave Ms. Toney a very good description of Plaintiff's education, training, experience, prior work duties, prior work performance, and managerial traits. In addition, Ms. Toney testified in her deposition that she had available Plaintiff's deposition. Dep. of Toney at p. 4, Exhibit 2, hereto. Volume I of the deposition includes extensive information concerning every job Plaintiff has had, and the specific duties and responsibilities associated with those jobs. Volume II of the deposition includes extensive information regarding Plaintiff's job search

Contrary to Plaintiff's misrepresentation in her motion, Ms. Toney did not testify in her deposition that she had never seen Plaintiff's job description before Plaintiff's counsel showed it to her during her deposition. Plaintiff and her counsel are well aware that the job description shown to Ms. Toney during her deposition was for a Project Manager position not Plaintiff's position as Director of Medicare Sales. This is apparent both from the deposition testimony and the job description itself. (See, Dep. of

5

Toney at 49, and the job description, which was Exhibit 5 to the deposition, Exhibit 2, hereto). This is an outright misrepresentation by Plaintiff. Plaintiff has never held a position as Project Manager, and there would be no reason for Ms. Toney to analyze that position in assessing Plaintiff's prior experience.

2. Brian McDonald Did Not Consider Plaintiff's Actual Qualifications and Skills

By contrast, Brian McDonald did not have Plaintiff's resume or prior employment history or performance in this file, and merely considered the fact that Plaintiff was a female, age 43, with one master's degree in doing his evaluation. (Dep. of McDonald at 37, Exhibit 3, hereto). He testified that this meant any kind of master's degree, and included females working in such comparatively lower-paying positions as teachers and social workers. Ibid. He considered no data for persons like Plaintiff who have two master's degrees, and no data based on Plaintiff's actual years of experience in a specific occupation or industry. Ibid, at 37-38. In fact, Dr. McDonald admitted that he was not certain what Plaintiff's two master's degrees are in. Ibid, at 9. He acknowledged that Plaintiff's actual education and experience would factor into her ability to obtain a job and the salary level of that job, but he has not considered either factor, Ibid, at 42. He further testified that he used Plaintiff's age as a "proxy" for experience, making the assumption that just because Plaintiff is 43, she would have a certain amount of experience. Ibid, at 38. Obviously, age does not equate with a person's actual experience, as particular individual's may not work at all after college, or may work extensively. Similarly, particular individual's may bounce from job to job or change careers, while others may work exclusively in one industry.

In short, unlike Janet Toney, Brian McDonald made no attempt to analyze or evaluate Plaintiff's actual, individual education, training, experience, work performance, and skill sets. He just made an assumption that Plaintiff would not be employed at for a 12-month period. (Dep. of McDonald, at 34, Exhibit 3, hereto). The

6

only attempt he made to tie his evaluation to the facts and issues in this case was to consider that Plaintiff was a female, age 43, and with any kind of a master's degree. This does not meet the particularized gatekeeping criteria of Kumho Tire.

    E.    <u>Labor Market Analysis</u>

        1.    <u>Janet Toney Analyzed Actual Jobs And Actual Trends In The Healthcare Field</u>.

The next step in Janet Toney's methodology was to conduct a labor market analysis, and in particular, a search of actual job openings in the healthcare market where Plaintiff had previously worked, and testified that she wanted to continue to work. (Dep. of Toney, at 33, Exhibit 2, hereto).[1] Ms Toney's analysis included researching the local classified ads, the Wall Street Journal, several different job banks on the Internet, the federally published Occupational Outlook Handbook, New Mexico 2006 Economic Projections, and the Medical Group Management Association. Ms. Toney identified 39 actual openings in New Mexico, approximately 200 positions off three websites on the Internet for a single date (August 4, 2000), another 25 positions off another website, and 177 more positions off another website. In the Wall Street Journal, Ms. Toney identified 774 positions in the healthcare marketing and management field from the Wall Street Journal. She attached numerous sample listings to her report. Ms. Toney's analysis revealed conclusively that there is no merit to Plaintiff's assertion that there were no "relevant" positions.

Ms. Toney's analysis and testimony will plainly assist the trier of fact to understand the evidence and to determine the facts relevant to the failure to mitigate damages defense. In New Mexico, the burden is on the employer to prove the defense.

---

[1] Plaintiff's assertion that Ms. Toney did not rely on any studies, or any studies particular to the healthcare industry, is completely inaccurate. Her report and her deposition testimony is replete with references to state, federal and privately published studies, statistics and data, including studies and data specific to the healthcare industry. Dep. of Toney, at 12, 25-26, 32. She did testify that there are no studies specific to Plaintiff. <u>Ibid</u>, at 46-47. That is precisely why Ms. Toney did such an individualized study of the labor market for a person with Plaintiff's skill set and qualifications.

7

McGinnis v. Honeywell, 110 N.M. 1 (1990). The Tenth Circuit has held that the employer may have to show not only that the plaintiff did not reasonably seek suitable work, but that suitable work was available. See, Whatley v. Skaggs Co., 707 F.2d 1129 (10th Cir.); cert. denied, 464 U.S. 938 (1983). Ms. Toney's labor market analysis directly and specifically addresses these issues, and will plainly assist the jury in determining whether suitable work existed.

Plaintiff mischaracterizes Ms. Toney's testimony concerning the sampling of positions she attached to her report. Contrary to the statements made by Plaintiff in her motion about Ms. Toney's "admitted errors", Ms. Toney's actual testimony concerning these samples was, as follows:

- Medical Director position (Ms. Toney specifically testified that this position did not require an M.D. Dep. of Toney, at 64, Exhibit 2, hereto).

- Assistant Marketing Manager (Ms. Toney specifically testified that Plaintiff has the transferable skills for this position based on her prior sales and marketing experience. Ibid. at 65.

- Senior Director of Product Marketing (bioimplant and grafts) (Ms. Toney specifically testified that this position involved a variety of products used in surgical procedures and contacts primarily with physicians, and promoting the products. Ibid, at 65-66. Plaintiff had prior similar marketing and sales experience, and had worked in marketing for a hospital and an acute care regional referral center. See, Plaintiff's resume, attached to the Dep. of Toney, Exhibit 1, hereto).

- Vice President Patient Services (Ms. Toney acknowledged that this position – one of over 1,000 she found, required a nursing degree which Plaintiff lacks).

- Regional Director/Glaucoma (Ms. Toney testified that the position required a BA in the field of pharmacy, nursing or business. Plaintiff has an MBA. Dep. of Toney, at 67, Exhibit 2, hereto).

8

In short, Plaintiff has identified only one of the more than 1,000 actual positions identified by Ms. Toney that required a qualification or skill that Plaintiff flacks or which would not transfer to the position. Clearly, this goes only to the weight of one small piece of her analysis, and does not demonstrate that it is unreliable.[2]

2. Brian McDonald Did Not Analysis Any Actual Job Opportunities

By contrast, Dr. McDonald did not attempt to identify any actual job openings or any actual salary ranges for persons with Plaintiff's qualifications. He made no attempt to determine what jobs fit her qualifications at all. Instead, he "just made an assumption" that Plaintiff would be unemployed in any job of any kind for all of 2000, and used U.S. Census data for females, 40-44, with one master's degree to assume she would start at $51,855 when she did find a job. Dep. of McDonald, at 34, 37-38, 41, Exhibit 3, hereto. He admitted that his assumption is not based on persons at director-level positions working with a health plan. Ibid, at 41. He used data for all females with master's degrees, irrespective of the type of occupations or industries, and disregarded recent studies which specifically indicate that the actual period of unemployment for displaced employees who, like Plaintiff, work in the service industry, is only about 4 weeks. Ibid, at 47-48. He further disregarded recent studies which focused on managers and professionals in service industries which specifically show that the actual period of unemployment has been 4.6 to 4.8 weeks. Ibid, at 49-50. The same studies showed that 45% of workers displaced from professional service positions actually earned 20% more in their new than

---

[2] Plaintiff's contention that Ms. Toney has not contacted all of the hundreds of employers to "check on the actual competition" for particular positions would impose an impossible burden not contemplated by Kumho Tire. An expert states opinions in terms of reasonable probabilities, not absolute certainty. Here, Ms. Toney testified that she took considered competition in terms of probabilities by 1) considering Plaintiff's specific skill base, 2) comparing that skill base with the plentiful number of job openings in her field, 3) low unemployment rates, meaning fewer people applying for those openings, 4) the healthcare industry represents a major portion of the gross national product, 5) the trend in the healthcare market is increasing growth, and 6) the studies show that managers and professionals in the service industries are re-employed within 4.6 to 4.8 weeks. See, Dep. of Toney, at 46, 52-55, Exhibit 2, hereto; Affidavit of Janet Toney, Exhibit 1, hereto.

their prior jobs. Ibid, at 50. Dr. McDonald also disregarded a recent study that specifically showed that persons displaced with advanced degrees actually experienced increased median weekly earnings of 11.7%. Ibid. Finally, Dr. McDonald admitted that, despite his assumption, there is no study whatsoever that indicates that persons with Plaintiff's age, education and work experience are not going to be employable at their pretermination levels for the rest of their work lives. Ibid, at 52.

Even worse, are Dr. McDonald's assumptions that Plaintiff, who had a base salary of $75.643, would have continued to earn commissions at Secure Horizons, raising her compensation to $113,631. Ibid, at 11, 12, 22. Contrary to the actual facts of the case, which Kumho Tire requires an expert's analysis to be tied to, Dr. McDonald is unaware that PHP ceased open enrollment of new Secure Horizons members and discontinued all active sales and marketing in 2000. Ibid, at 24. He does, however, understand that commissions are based on achieving certain sales goals, and that if PHP is no longer selling the Secure Horizon's product, Plaintiff would no longer be receiving the same level of commissions. Ibid, at 25.

Again, unlike Janet Toney, Dr. McDonald has failed to tie his evaluation of lost wages to the particular facts and issues of this case, as required by Kumho Tire. Unlike the expert opinion in Kumho Tire, which was at least based on the expert's visual and tactile inspection of the failed tire, Dr. McDonald has not even looked at the Plaintiff's actual qualifications, the actual compensation which would be payable in her prior job at Secure Horizons, the actual jobs that are available, or the actual salaries being paid to persons in similar healthcare positions. Dr. McDonald's evaluation is analogous to a tire failure expert evaluating a tire failure without looking at the tire, without considering its actual qualities, without considering the prior history or experience of the tire, and without considering what the actual conditions which cause tires to either fail or not fail are. In short, a tire expert cannot reliably testify about the failure of a particular tire, under particular conditions, by merely assuming that it is just like ever other

tire of a certain age and brand, and an expert cannot reliably testify about a particular person's employability or lost earnings by assuming that person is just like every other female, age 40-44, with a master's degree.

The case cited by Plaintiff, Broussard v. University of California, 192 F.3d 1252 (9th Cir. 1999), only reinforces PHS' position that Janet Toney, not Brian McDonald, has satisfied the criteria set forth in Kumho Tire. In Broussard, the expert's analysis incorrectly was based on a lifting restriction that did not actually exist, and his conclusion was based on general categories like "sedentary" or "light" work, rather than actual jobs. The court stated:

> Church's declaration is akin to the statements presented in Bolton v. Scrivner where the evidence did not address plaintiff's "vocational training, the geographical area to which he has access, or the number and type of jobs demanding similar training from which [plaintiff] would also be disqualified." 36 F.3d 939, 944 (10th Cir. 1994). Church's declaration likewise does not take Broussard's vocational abilities into account. Rather, Church based his conclusions on categories of jobs, i.e. "Sedentary" and "Light manual." Broussard relies on Dalton v. Subaru-Isuzu Automotive, Inc., 141 F.3d 667 (7th Cir. 1998), to support her argument that the Church declaration raises a genuine issue of material fact. In Dalton, the court found that an affidavit from a vocational rehabilitation counselor, coupled with the testimony of the plaintiffs, did raise a genuine issue of material fact regarding whether they were substantially limited in their ability to work. See id. at 675-76. Initially, the lower court had struck the vocational counselor's affidavit because it was too general. The first affidavit had not compared the number of jobs plaintiffs could do before and after the onset of their disabilities. Moreover, it looked at the entire country instead of the region where plaintiffs would look for work and the time periods for the statistics were unclear. Id. at 675.

Id, at 1258.

In this case, Janet Toney addressed the Plaintiff's specific education, training, experience and past work performance. Dr. McDonald only considered that she was female, age 43, with any type of master's degree. Here, Ms. Toney analyzed actual jobs that were available in Plaintiff's field. Dr. McDonald, like the expert in Broussard, based his conclusions on general categories, and did not address at all whether actual jobs were available for a person with Plaintiff's qualifications. As the court in Broussard concluded, Dr. McDonald's testimony should be stricken because it is too general. Id.

F. Other Daubert Factors

1. General Acceptance.

Probably the best evidence supporting the general acceptance of Janet Toney's analysis in the relevant community, is Brian McDonald's own testimony. Dr. McDonald testified that he made no attempt to assess Plaintiff' actual employability because he is not a vocational expert. Dep. of McDonald, at 38, Exhibit 3, hereto. He testified that he knows Janet Toney, he has worked with her before, and she is a vocational expert. Ibid. Dr. McDonald testified that Ms. Toney conducts a labor market analysis to see what jobs fit a person's particular education and experience, and that he has relied upon her opinions when she has performed such an analysis. Ibid, at 39. According to Dr. McDonald, Ms. Toney is recognized as an expert in her field, and in the cases they have both worked on , she has performed a labor market analysis to see what jobs were available and compared them to the skill set of the particular individual. Ibid, at 40. Dr. McDonald has seen other experts do the same thing, and he assumes that is the accepted approach within the vocational industry. Ibid.

PHS is attaching the Affidavit of Janet Toney indicating that the approach and methodology she used in conducting her employability analysis in this case is generally accepted in the vocational industry. Exhibit 1, hereto. While Plaintiff attempts to characterize this type of analysis as "something dreamed up" by Ms. Toney, this again is a case of mischaracterization by the Plaintiff. Ms. Toney testified in her deposition that an

employability analysis is a term she and other professionals use to establish whether or not someone has the transferability of skills and the ability to become employed in the job market. Dep. of Toney at 12, Exhibit 2, hereto. "Employability" and "earnings capacity" are interchangeable terms used by professionals in vocational rehabilitation. Ibid, at 13-14. What Ms. Toney did in this case is the same thing as an earnings capacity evaluation. Ibid, at 15. Indeed, Ms. Toney testified that the Social Security Administration similarly looks at employability based on transferable skills, and she could just as easily entitled her report "Transferable Skills Analysis", since what she did was look at Plaintiff's education, experience, training and work traits, and closely align them with other similar jobs or occupational groups. Ibid, at 16. While it is true that Ms. Toney responded in her deposition that she did not take a course in college specifically entitled "employability analysis", she clarified several times that this term is interchangeable with other terms, and that much of her course work involved job placement, earnings capacity, analysis of skills and transferable skills, and labor market analyses. Affidavit of Janet Toney, Exhibit 1, hereto. Indeed, in her deposition, Ms. Toney testified that such concepts were covered at a course she had just taken the same week as her deposition. Dep. of Toney, at 23, Exhibit 2, hereto.

It is also a mischaracterization that Ms. Toney is unable to cite any journals or publications using these terms. In her deposition she testified that she would be happy to check the journals to provide this information. Ibid, at 16. She has checked, and has itemized such publications in her attached affidavit, Exhibit 1, hereto.

The methodology used by Ms. Toney is the same as that required by the Social Security Administration, and which is used by other vocational experts in assessing the employability of an individual displaced from a position because of accident, injury or elimination of position. See, Affidavit of Janet Toney.

By contrast, Brian McDonald's "assumptions" that the Plaintiff would not work at all in any job for all of 2000, that if she found work, it would only be at

13

one-half of her prior compensation, and that it would take 3-5 years for her to return to her pre-layoff level of compensation are not based on any accepted methodology, any analysis, or any study. To the contrary his assumptions are directly at odds with the most recent studies which have been done by Hipple, Challenger and the U.S. Department of Labor. See, discussion, above, and the Affidavit of Janet Toney, Exhibit 1, hereto.

2. Error Rate.

As the Court in <u>Kumho Tire</u> made clear, the factors identified in <u>Daubert</u> may not be applicable to a particular case. Plaintiff's employability and her failure to reasonably mitigate her damages are not scientific issues. Rather, they are issues requiring specialized knowledge and experience comparing a person's qualifications with jobs available in the labor market. Nevertheless, Janet Toney's opinions are also based on actual studies which have been performed on displaced workers.

First, Ms. Toney's opinion that Plaintiff did not even make minimum efforts to find other employment is supported by the following:

- The New Mexico Department of Labor requires a minimum of three contacts per week to remain eligible for unemployment compensation. Plaintiff made only 16 contacts in 30 weeks.

- A person with a handicap would be expected to make 25 direct applications, 20 networking contacts, read 14 newspapers, and contact 4 third parties, <u>each</u> week. See, "Competitive Job-Finding Guide for Persons with Handicaps".

- Direct contacts, of which Plaintiff only made 16 in 30 weeks, are demonstrably the principal method of obtaining employment. See, "Knock 'Em Dead, the Ultimate Job Seeker's Handbook."

14

- The Internet, which Plaintiff relied on extensively, is a largely ineffective job-hunt tool, statistically revealing that only 4% of those who job hunt on the Internet actually find a job thereby. Forrester Research, April 2000.
- The specialized knowledge obtained by Ms. Toney in 20 years of working with individuals attempting to obtain employment, has demonstrated that at least 15 contacts per week is the minimum. Affidavit of Janet Toney, Exhibit 1, hereto.

Second, Ms. Toney's opinion that Plaintiff should have reasonably been expected to obtain other employment of a similar nature and salary within 60-90 days, is supported by the following:

- A study published in July, 1999 by Steven Hipple (which was cited, but disregarded by, Brian McDonald), indicates that employees in a service industry, like Plaintiff, have periods of unemployment of only 4 weeks.
- The Hipple study showed that managerial or professional specialty employees, were without work for a median period of only 4.6 to 4.8 weeks.
- The Hipple study showed that 45% of professional services workers (the largest percentage of any occupational category), earned 20% or more in their new than their old jobs.
- The Hipple study showed that displaced employees with advanced degrees, like Plaintiff, had increased median weekly earnings by 11.7% in their new jobs.

15

- The Challenger Job Market Index compiled by Challenger, Gray & Christmas, which analyzed the first quarter of 2000 (a directly relevant time period to this case), showed that a median job search lasted 3.58 months.[3]

- The specialized knowledge obtained by Ms. Toney in 20 years of experience with 1000's of displaced workers. In her experience, the average period for job search, even for disabled employees and for employees with much less education than Plaintiff, has been 60-90 days.

- Employment of Health Services Managers is expected to grow faster than average for all occupations through the year 2008. Occupational Outlook Handbook published by the U.S. Department of Labor.[4]

- The Medical Group Management Association reported that depending on the size of the group, the salary range for Administrators even in 1998 was $60,000 to $124,500.

---

[3] Plaintiff's assertion that because Ms. Toney does not know James Challenger personally her reliance on the study conducted by Challenger, Gray & Christmas is absurd. Ms. Toney testified that she is familiar with that firm, which is a job development company, and that she has relied on the studies in the past. Dep. of Toney, at 6, Exhibit 2, hereto. Nothing in Daubert or Kumho Tire purports to require personal familiarity with individuals who have conducted and published studies in the field of job development or vocational placement. Plaintiff's assertion is analogous to requiring Brian McDonald to personally know the individuals who compiled the census data he relies upon.

[4] Plaintiff's argument that Ms. Toney has no understanding of how the Department of Labor developed the statistics in the Occupational Outlook Handbook is ill-conceived at best. Ms. Toney testified that the data is compiled by local agencies which send out surveys to nearly every employer, which are then statistically compiled, making sure that there are a statistically significant number of responses. Dep. of Toney, at 26-30, Exhibit 2, hereto. Ms. Toney further stated that the exact methodology used by the U.S. Department of Labor for the Occupational Outlook Handbook and New Mexico 2006 Economic Projections was available. Ibid, at 48-49. She has attached the respective methodologies to her Affidavit, Exhibit 1, hereto.

3. <u>Tested Or Can Be Tested</u>

Again, a vocational expert's analysis of employability for a particular individual is not a scientific procedure which has been tested. However, Janet Toney's opinions are supported by the actual studies cited above, and the specialized knowledge she has obtained in 20 years of working with displaced workers, and analyzing the labor market.

Certainly, Ms. Toney's analysis, which is based on Plaintiff's <u>actual</u> qualifications and <u>actual</u> jobs and trends in the labor market <u>can</u> be tested, whereas Dr. McDonald's theoretical assumptions are not based on any facts other than that Plaintiff is a female, age 43, with one (instead of 2) master's degree, and he has not considered any actual jobs which could be tested to see if they are suitable to Plaintiff's qualifications..

4. <u>Peer Review and Publication</u>

Ms. Toney's methodology is <u>the</u> methodology employed by the Social Security Administration, the New Mexico Department of Vocational Rehabilitation, and vocational rehabilitation consultants <u>See</u>, Affidavit of Janet Toney, Exhibit 1, hereto. For example, in her affidavit, Ms. Toney attaches the criteria for vocational experts required by the Bureau of Hearings and Appeals of the Social Security Administration. The criteria is the same as that employed by Ms. Toney in this case. Exhibit 1, hereto.

By way of example only, the same methodology is also published in "Competitive Job Finding Guide For Persons With Handicaps", by Chet Muklewicz, Ed.D., Career and Employment Counselor, and Michael Bender, Ed.D., Professor of Education, Johns Hopkins University, and "A Guide To Rehabilitation," by Paul M. Deutsch, Ph.D. and Horace W. Sawyer, Ed.D. <u>See</u>, Affidavit of Janet Toney, Exhibit 1, hereto.

By contrast, Brian McDonald's methodology was to assume that Plaintiff would be able to find any job for a year, then would start at a salary of $51,000 because that is the median starting salary for all females, age 40-44, with one master's

degree. This is not only not generally accepted, but is contrary to the studies which have been done. Indeed, he admits that he used this methodology only because he was not provided with a vocational evaluation and labor market analysis prepared by a vocational expert like Janet Toney.

G.  Conclusion

FOR THE FOREGOING REASONS, PHS requests that the Court deny Plaintiff's motion.

KELEHER & McLEOD, P.A.

By _____
ROBERT C. CONKLIN
JACQUELINE M. WOODCOCK
P. O. Drawer AA
Albuquerque, New Mexico 87103
(505) 346-4646
*Attorneys for Defendant,*
*Presbyterian Healthcare Services, Inc.*

I HEREBY CERTIFY that a true and correct copy of this Motion was hand-delivered on January _, 2001 to:

Edward Hollington
708 Marquette, NW
Albuquerque, NM 87102-2035

_____
Robert C. Conklin

lcb0920

THE EXHIBITS ATTACHED TO THIS PLEADING ARE TOO VOLUMINOUS TO SCAN. SAID EXHIBITS ARE ATTACHED TO THE ORIGINAL PLEADING IN THE CASE FILE WHICH IS LOCATED IN THE RECORDS DEPARTMENT, U.S. DISTRICT COURT CLERK'S OFFICE.